**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: October 17, 2016

**NO. 33,618**

**CRAIG BEAUDRY,**

      Plaintiff-Appellee,

v.

**FARMERS INSURANCE EXCHANGE,**
**TRUCK INSURANCE EXCHANGE,**
**FIRE INSURANCE EXCHANGE,**
**MID-CENTURY INSURANCE COMPANY,**
**FARMERS NEW WORLD LIFE INSURANCE**
**COMPANY, FARMERS INSURANCE**
**COMPANY OF ARIZONA, LANCE CARROLL,**
**and CRAIG ALLIN,**

      Defendants-Appellants,

and

**FARMERS GROUP, INC., TOM GUTIERREZ,**
**and CHRISTOPHER KERR,**

      Defendants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

O'Friel and Levy, P.C.
Pierre Levy
Aimee Bevan
Santa Fe, NM

Law Office of Barry Green
Barry Green
Santa Fe, NM

for Appellee

Lewis Roca Rothgerber Christie LLP
Ross L. Crown
Albuquerque, NM

Lewis Roca Rothgerber Christie LLP
Steven J. Hulsman
Kristina N. Holmstrom
Phoenix, AZ

Skadden, Arps, Slate, Meagher & Flom LLP
Raoul D. Kennedy
James P. Schaefer
Palo Alto, CA

for Appellants

Brownstein Hyatt Farber Schreck, LLP
Eric R. Burris
Nury H. Yoo
Albuquerque, NM

for Amicus Curiae Association of Commerce and Industry of New Mexico

**_____OPINION**

**SUTIN, Judge.**

{1}     Plaintiff Craig Beaudry received substantial compensatory and punitive damages jury verdicts on his claim of prima facie tort against various Farmers Insurance companies (the Companies)[1] and two Farmers employees, Lance Carroll and Craig Allin (altogether, Defendants). At trial, Plaintiff proved that, in terminating his insurance agent agreement (the Agreement), Defendants intended to harm and actually harmed Plaintiff with malice and without justification. Defendants' appeal asserts that the district court erred as a matter of law in submitting prima facie tort to the jury because termination of the Agreement was determined by the district court to be lawful and authorized under the terms of the Agreement. Defendants also attack the punitive damages award as unconstitutional.

{2}     The approaches of the parties diverge significantly. Defendants treat the factual detail of their proved malicious, intentionally harmful conduct in terminating the Agreement as irrelevant as a matter of law, whereas Plaintiff focuses heavily on that conduct as the underlying appropriate basis for application of prima facie tort. Defendants represent that, based on their global legal research, "[u]pholding the

---

[1] Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, and Farmers Insurance Company of Arizona.

verdict [in this case] would make this Court the first appellate tribunal in America to hold that prima facie tort can be used on a contract termination expressly authorized by the contract itself." Plaintiff interprets New Mexico case law as permitting the application of prima facie tort in the circumstances under which Defendants' termination of the Agreement was expressly authorized by a for-cause termination provision in the Agreement.

{3}     As this Opinion lays out, how this case was tried by the parties is a crucial and compelling consideration in how the author of this Opinion (referred to hereafter in the first person) decides Defendants' issues on appeal. I hold that, under the particular manner in which this case was tried, prima facie tort was properly sent to the jury, and the majority affirms the judgment and the orders denying Defendants' post-trial motions for judgment as a matter of law. The majority also holds that the jury's award of punitive damages was not unconstitutional and affirms the award.

**BACKGROUND**

**A.     Defendants' Presentation of Facts**

{4}     In conformity with their approach that purely legal issues are to be addressed and decided, Defendants limit their presentation of the facts to the few that relate to the Agreement and that bear upon the appellate issues, the majority of which I quote here from Defendants' brief in chief.

{5} "[Plaintiff] was an insurance agent who contracted to sell insurance policies on behalf of the Companies under [the] . . . Agreement[.] . . . Lance Carroll contracted with the Companies to be a District Manager for the territory that included [Plaintiff's] agency. . . . Craig Allin served as the Companies' State Director in New Mexico." "The Agreement specified that [Plaintiff] was an 'independent contractor.' The Agreement obligated [Plaintiff] to 'submit to the Companies every request or application for insurance for the classes and lines underwritten by the Companies and eligible in accordance with their Rules and Manuals.' It further provided that, '[a]ll business acceptable to the Companies and written by the Agent will be placed with the Companies,' and that the Agent must 'servic[e] all policyholders of the Companies in such a manner as to advance the interests of the policyholders, the Agent and the Companies.' The Agreement was terminable upon three months[] written notice and terminable for specified reasons on thirty days[] written notice. One of the specified reasons was '[s]witching insurance from the Companies to another carrier.' "

{6} "From 2000 through 2011, [Plaintiff] operated an insurance agency in Taos, [New Mexico,] selling policies to the Companies' policyholders pursuant to the Agreement. One of those policyholders was Moises Martinez. In September 2010,

[Plaintiff][2] placed one of Martinez's policies with a rival carrier, i.e., CNA. [Defendants] investigated and concluded that [Plaintiff's] agency had breached the Agreement. [Defendants] elected to terminate the Agreement in accordance with the Companies' policy of terminating agents who place eligible business outside the Companies." "By letter dated February 1, 2011, the Companies notified [Plaintiff] that the Agreement would be terminated effective March 5, 2011. The termination date was later changed to March 24, 2011. [Plaintiff], therefore, received [fifty-one] days[] notice of his termination—well in excess of the [thirty] days required for termination based on a breach of the Agreement." "[Plaintiff's] termination was considered by a Termination Review Board and ultimately upheld by the Companies."

**B.      Plaintiff's Presentation of Facts**

{7}      In stark contrast, in his answer brief, Plaintiff recites approximately twenty-one pages of facts covering, in detail, everything that went to the jury on his prima facie tort claim, including proof of malicious intent to harm him, actual and significant harm to him, improper, offensive, and unfair means employed by various Farmers' employees, absence of justification, and compensatory damages. According to Plaintiff, despite his stellar record as an agent, his contract was terminated after he

---

[2] The record indicates that Plaintiff's employee, April Granger, placed the policy with CNA.

4

complained to his supervisor, Carroll, and his supervisor's supervisors about a fellow agent who was "poaching" clients. Additionally, Plaintiff states that by terminating the Agreement, Carroll and Allin profited financially and in job security by terminating Plaintiff and distributing the policies previously held at Plaintiff's agency. Among many other details, Plaintiff outlines broken promises Defendants made to Plaintiff, including Defendants' assurance that his hard work would pay off and that only "deadbeat" agents were terminated. Plaintiff admits that his employee mistakenly and temporarily transferred a Farmers policy to another company, but explains that the error was quickly remedied. This error occurred at a time when the agency was stressed due to the absence of Plaintiff's wife, Dee, who handled operations at the agency, but who had lost both kidneys and was forced to relocate to Denver for intensive treatment. Despite his having corrected the mistake quickly, Plaintiff states that he was ambushed, that his termination was engineered, and that he was never given a full opportunity to explain the situation either before his termination or after. He describes feelings of shock, betrayal, and depression. It is a given, based on the jury verdict, that the facts Plaintiff presented showed the termination of Plaintiff's agency was based on unjustifiable motives, including actual and malicious intent to harm Plaintiff, greed, personal self-interest, and retribution. In their reply brief, Defendants characterize Plaintiff's factual presentation as

5

"irrelevant" and as "a skewed version of the record in an attempt to garner sympathy and divert attention from the fatal legal defects in his prima facie tort claim."

{8} Based on the record, the majority treats the facts as provided in Plaintiff's answer brief as established and uncontrovertible. In considering the elements of prima facie tort, the jury obviously believed enough of Plaintiff's extensive factual detail to conclude that the elements were satisfied.

**C. Procedural**

{9} Plaintiff's operative complaint set out eight claims for relief sounding in contract and tort: "tortuous[3] interference with contract"; "tortuous interference with prospective contractual relations"; breach of contract; breach of the covenant of good faith and fair dealing; conspiracy; intentional infliction of emotional distress; prima facie tort; and violation of the New Mexico Insurance Code. Presumably, these claims were set out because Plaintiff believed that each of the eight claims stated a claim upon which relief could be granted. Plaintiff also sought punitive damages.

{10} During the course of litigation, Defendants filed numerous dispositive motions, including a motion for summary judgment on what Defendants characterized as Plaintiff's claim for wrongful termination of the Agreement. In this motion, Defendants sought a ruling that the termination of the Agreement was authorized

---

[3] Although "tortuous" (i.e., complicated or complex) may be the proper term to describe this case, it is clear Plaintiff meant "tortious" (i.e., causing a tort).

6

under the terms of the Agreement, and thus, Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and any other claim "premised in whole or [in] part on wrongful termination of the Agreement" should be dismissed. In response, Plaintiff argued that genuine issues of material fact existed as to whether "Defendants legitimately fired [Plaintiff] for breach of contract." Plaintiff's argument in opposition primarily focused on the question of whether he could be found to have breached the Agreement, and thus be subject to termination, when his employee switched an insured's policy in violation of Plaintiff's instructions. Plaintiff also argued that there were "disputes of fact on whether Defendants actually fired [Plaintiff] for breaching his contract" and that Defendants' "inconsistent reasons" for terminating Plaintiff created "a reasonable inference that the reasons were bogus[.]"

{11}     The district court granted Defendants' motion "on the issue of breach of contract regarding the termination" and concluded that "the contract was properly terminated" because it was undisputed that an existing insured's policy was moved to another insurer in violation of the Agreement and because the district court concluded that Plaintiff bore the responsibility of his employee's breach. Plaintiff did not appeal the district court's decision and order, and the parties appear to have agreed that, in addition to dismissing the breach of contract claim, the decision and

7

order also dismissed the breach of the implied covenant of good faith and fair dealing claim.

{12}   The only claims for relief ultimately presented to the jury were (1) conspiracy by individual defendants to commit prima facie tort, and (2) prima facie tort committed by all defendants as to the termination of the Agreement. The remainder of the claims for relief were either dismissed by the district court based on the court's determination that the claims were not meritorious or were dismissed when Plaintiff chose not to pursue the claims because he felt those claims were not viable given certain rulings by the court.

{13}   The jury found against Plaintiff on the conspiracy claim but found in favor of Plaintiff on the prima facie tort claim, awarding $1 million in compensatory damages and $2.5 million in punitive damages. Post trial, Defendants filed a renewed motion for judgment as a matter of law, on the ground that the prima facie tort claim was legally deficient, and a renewed motion for judgment as a matter of law or for a new trial because the prima facie tort claim was not supported by the evidence. In addition, Defendants filed a motion to vacate or remit the punitive damages award. The district court denied all three post-trial motions.

{14}   Defendants appeal asserting that (1) the prima facie tort claim evaded the stringent requirements of multiple established doctrines of law; (2) Plaintiff failed as

a matter of law to satisfy at least four of the five essential elements of prima facie tort; (3) affirmance of the judgment would mean that parties who properly perform their contracts face greater exposure than those who breach them; and (4) the punitive damages award is unconstitutional.[4]

**D.      Prima Facie Tort Law in New Mexico**

{15}      I preface discussion of the issues and the analysis with a brief introduction to pertinent prima facie tort law in New Mexico. These cases and some additional ones will be discussed in this Opinion as needed and as I address the parties' legal arguments.

{16}      Prima facie tort became part of our common law with its adoption in 1990 in *Schmitz v. Smentowski*, 1990-NMSC-002, 109 N.M. 386, 785 P.2d 726. *Schmitz* sets out the following four elements that are required to establish a prima facie tort claim: (1) an intentional, lawful act by the defendant; (2) an intent to injure the plaintiff; (3) injury to the plaintiff, and; (4) the absence of justification or insufficient justification for the defendant's acts. *Id.* ¶ 37. The *Schmitz* Court molded the doctrine

---

[4] Although one of Defendants' post-trial motions questioned the sufficiency of the evidence to support Plaintiff's prima facie tort claim and in the notice of appeal Defendants purport to appeal the order denying that motion, in their briefs and during oral argument on appeal Defendants focus primarily on their legal argument, and Defendants explicitly stated during oral argument that their appeal is not a sufficiency of the evidence appeal. Because Defendants chose to focus on legal arguments and did not continue to argue that there was insufficient evidence, I narrow the review accordingly.

from mixtures of New York and Missouri case law and the Restatement (Second) of Torts § 870 (Am. Law Inst. 1979). *Schmitz*, 1990-NMSC-002, ¶¶ 35-48. "To constitute a prima facie tort, the tort-feasor must act maliciously, with the intent to cause injury, and without justification or sufficient justification." *Id.* ¶ 45; *see also* Restatement (Second) of Torts § 870 cmt. e (indicating that "injury . . . means that the harm must be to a legally protected interest of the plaintiff"). "[I]t need not be shown that the act was solely intended to injure plaintiff." *Schmitz*, 1990-NMSC-002, ¶ 47. "[I]f a defendant offers a purpose other than the motivation to harm the plaintiff as justification for his actions, that justification must be balanced to determine if it outweighs the bad motive of the defendant in attempting to cause injury." *Id.* ¶ 46. In assessing that motive, "the intent [is to] be balanced to determine if the activity was beyond the bounds of what society should tolerate." *Id.* ¶ 57. This balancing test has since been applied in a number of cases. *See, e.g.*, *Portales Nat'l Bank v. Ribble*, 2003-NMCA-093, ¶¶ 3, 10, 134 N.M. 238, 75 P.3d 838 (employing the balancing test and finding that there were genuine issues of material fact that precluded summary judgment); *Martinez v. N. Rio Arriba Elec. Coop., Inc.*, 2002-NMCA-083, ¶¶ 26-31, 132 N.M. 510, 51 P.3d 1164 (reversing a jury verdict based on prima facie tort after considering the factors, concluding that none of the plaintiff's proof taken alone or together "[rose] to the level of both behavior and injury that is envisioned by the

10

theory of prima facie tort[,]" and holding that the plaintiff "did not have an actionable claim for prima facie tort"); *Beavers v. Johnson Controls World Servs., Inc. (Beavers II)*, 1995-NMCA-070, ¶¶ 20-22, 120 N.M. 343, 901 P.2d 761 (balancing the factors and determining that, under the facts, the plaintiff's claim "passed the threshold of a submissible prima facie tort" claim).

{17}      Further, *Schmitz* states that "prima facie tort may be pleaded in the alternative; however, if at the close of the evidence, [the] plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted to the jury on that cause and not under prima facie tort." 1990-NMSC-002, ¶ 48. This is because "double recovery may not be maintained, and the theory underlying prima facie tort—to provide [a] remedy for intentionally committed acts that do not fit within the contours of accepted torts—may be furthered, while remaining consistent with modern pleading practice." *Id.* In recognizing the limits of prima facie tort, *Schmitz* states that "prima facie tort should not be used to evade stringent requirements of other established doctrines of law." *Id.* ¶ 63. This limitation has been recognized, restated, and reformulated at various times by this Court. *See, e.g.*, *Healthsource, Inc. v. X-Ray Assocs. of N.M.*, 2005-NMCA-097, ¶ 35, 138 N.M. 70, 116 P.3d 861 (stating that "prima facie tort should not lie when the pleaded factual basis is within the scope of an established tort" and affirming the rationale that

11

"a prima facie tort claim may not be used as a means of avoiding the more stringent requirements of other torts"); *Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶¶ 21-24, 137 N.M. 80, 107 P.3d 520 (reversing a prima facie tort judgment because, although the plaintiff was unable to establish a claim under intentional interference with contract, intentional interference with contract was the appropriate claim to bring, and thus "existing causes of action provided reasonable avenues to a remedy for the asserted wrongful conduct"); *Ribble*, 2003-NMCA-093, ¶¶ 11-12 (recognizing the requirement that "prima facie tort should not be used to evade stringent requirements of other established doctrines of law[,]" but determining that prima facie tort was appropriate because no other accepted tort was pursued (alteration, internal quotation marks, and citation omitted)); *Stock v. Grantham*, 1998-NMCA-081, ¶¶ 38-39, 125 N.M. 564, 964 P.2d 125 (holding that dismissal of the plaintiff's prima facie tort claim was proper because "[t]he only function of the claim of prima facie tort in [the plaintiff's] complaint [was] to escape possible restrictions imposed on the torts of intentional infliction of emotional distress and interference with entitlement to unemployment compensation"). Prima facie tort is not "a catch-all alternative for every action that cannot stand on its own legs," and courts must consider whether a prima facie tort claim is "merely duplicative" of some other claim. *Hagebak v. Stone*,

2003-NMCA-007, ¶¶ 27, 29, 133 N.M. 75, 61 P.3d 201 (internal quotation marks and citation omitted).

**DISCUSSION**

**A.    Standard of Review**

{18}    Under Defendants' pure as-a-matter-of-law approach as to the propriety of prima facie tort, de novo is the proper standard of review. *Apodaca v. AAA Gas Co.*, 2003-NMCA-085, ¶ 15, 134 N.M. 77, 73 P.3d 215 ("Questions of law require de novo review."). Additionally, the appellate courts review the punitive damages award de novo. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶¶ 17-19, 132 N.M. 401, 49 P.3d 662 (stating that appellate courts review de novo the constitutionality of a punitive damages award by "mak[ing] an independent assessment of the record").

**B.    Introductory Setting**

{19}    Before addressing Defendants' specific arguments, it is important to underscore the difficulty of this appeal both conceptually and under the particular circumstances of this case. This appeal shows how the uncertainties and incongruities of prima facie tort can create trial and appellate conundrums.

{20}    First, under New Mexico law, an essential element of prima facie tort is that the wrongdoer's conduct must be lawful. *See Schmitz*, 1990-NMSC-002, ¶ 37. That

13

element was arguably proved in this case given that the district court concluded the termination of the Agreement was proper under an express for-cause provision in the Agreement. The "lawfulness" element exposes analytical tension between tort and contract law—a tension that seems logically irreconcilable when a contract termination, deemed *lawful* under contract principles, must necessarily at the same time be an *unlawful* contract termination in prima facie tort. This case shows how problematic a case can be when it involves termination of a contract that implicates both contract and tort claims for relief.

{21} Second, how and when prima facie tort can properly be applied suffers from a lack of clarity in our case law. There exists an inherent tension between the recognition of prima facie tort as a valid tort claim that can be alternatively pleaded, on the one hand, and the strict requirements imposed on application of the tort, including that the tort cannot be used to evade established doctrines of law, on the other hand. This tension, as to when prima facie tort ought to be submitted to a jury and when it should not because it evades other established doctrines of law, is highlighted and evidenced by the fact that the three panel members have significantly different views on how this appeal should be decided. This tension is palpable in the present case where Plaintiff may have had a viable contract claim had he properly pleaded and pursued that claim, and where application of a prima facie tort claim could have been shown to be evasive had the parties litigated the case differently.

14

Although not specifically highlighted by either party on appeal, that inherent tension has been exacerbated by our case law, which does not clarify when and under what circumstances (1) a doctrine of law is established, and (2) an established doctrine of law is to be considered one that cannot be evaded by the application of prima facie tort.

{22} For example, in one instance, this Court held that the existence of an established, but ultimately unproved, claim prohibited submission of prima facie tort to the jury. *See Bogle*, 2005-NMCA-024, ¶¶ 22-24 (concluding that prima facie tort was prohibited because the plaintiff's intentional interference with contract claim, although ultimately not meritorious, was appropriate and thus "existing causes of action provided reasonable avenues to a remedy for the asserted wrongful conduct"). In another instance, this Court held that a plaintiff's decision not to pursue an established tort claim and the defendant's failure to identify a duplicative claim under an accepted category of tort claims, meant that prima facie tort could proceed to the jury. *See Ribble*, 2003-NMCA-093, ¶¶ 11-12 (concluding that the plaintiff's prima facie tort claim was appropriate because no other accepted tort was pursued, although another accepted tort claim was pleaded). The lack of clarity as to the parameters of prima facie tort gives rise to a number of unanswered questions: Should a prima facie tort claim be submitted to a jury if there is some established duplicative claim that exists but was not pleaded? What if a duplicative claim was pleaded but dismissed?

Does it matter if the duplicative claim was pleaded but dismissed on the merits, as opposed to dismissed for failure to state a claim upon which relief can be granted? Although I do not address all of these questions in this Opinion, this case nevertheless brings these tensions to the surface.

{23}     Third, the manner in which this case was tried in district court, coupled with all of the aforementioned tensions, forces a result with which I am not particularly comfortable and results in an opinion that will likely be of little value to future parties seeking to resolve whether prima facie tort is appropriate. As stated in the procedural section of this Opinion, the district court dismissed many of Plaintiff's tort and contract claims, including Plaintiff's breach of contract claim and breach of the implied covenant of good faith and fair dealing claim based on the court's ruling that the termination of the Agreement was proper and authorized.[5] As a result of that order regarding the appropriateness of the termination, and without objection by Defendants, Plaintiff did not believe that his remaining contract-related or tort claims were viable and decided not to pursue those claims. Thus, by the time the case went

---

[5] As stated in the procedural section of this Opinion, the parties apparently agreed that the order, which concluded that the termination was authorized, dismissed the breach of contract claim as well as the breach of the implied covenant of good faith and fair dealing claim. I will explore this interpretation in more detail later in this Opinion, however, for narrative clarity, it is noted here that the parties believe that the court's order disposed of both contract-related claims as they pertain to wrongful termination, and neither party appealed that order.

16

to trial, there were no other tort or contract claims being pursued by or available to Plaintiff that could address the malicious termination carried out by Defendants.

{24} I note that there exist differences within the panel in regard to the manner in which this case was tried. The Dissent, which seeks reversal, says that the manner in which the case was tried is "hardly the fault of Defendants." Dissent *infra* ¶ 94. The Special Concurrence "see[s] no reason to second-guess the parties' litigation strategy[,]" Sp. Con. *infra* ¶ 66, and concludes that "[t]here is nothing to be gained and much to be lost" by second guessing the manner in which the case was tried. Sp. Con. *infra* ¶ 81. In view of the differences within the panel as to the proper application of prima facie tort and the unfortunate circumstance that viable, established contract-related theories of unlawful termination escaped the attention of the parties and apparently the court, I prefer to highlight the problems, uncertainties, and ambiguities stemming from the application of prima facie tort, and prefer to pointedly limit its application to the facts and circumstances of how this case was tried.

{25} Understanding that this case requires resolution despite the problems, uncertainties, and incongruities in the application of prima facie tort, I proceed to discuss why the majority affirms the district court's submission of prima facie tort to the jury under the circumstances here. I view this Opinion as laying the groundwork

17

for our Supreme Court to establish more clarity as to the appropriate application of prima facie tort.

## C.   Defendants' Approaches

{26}   I see Defendants' prima facie tort arguments on appeal as falling within three categories: doctrinal, element-based, and policy-oriented, each presenting purely legal issues. Defendants' first argument—that Plaintiff's prima facie tort claim evaded the stringent requirements of multiple established doctrines of law—focuses on the fundamental doctrinal differences between contract law and tort law. Defendants' second argument focuses on the alleged inability of Plaintiff to meet the elements of prima facie tort in light of the district court's ruling that the contract was properly terminated. Finally, Defendants' third argument appeals to the practical and policy concerns associated with applying prima facie tort to conduct governed by and lawful under contract law. Each argument is examined in turn.[6]

---

[6] Defendants' arguments are supported by and expanded upon in an Amicus Curiae brief filed by the Association of Commerce & Industry of New Mexico (ACI). ACI states three points in its appellate brief as to application of prima facie tort: (1) "creates ambiguity and unpredictability in contractual relations, upending long-established business principles and expectations"; (2) "contradicts existing bodies of substantive law"; and (3) "creates a hostile business environment in New Mexico for individuals and businesses, and thereby stifles economic growth and investment[.]" Because ACI's points largely duplicate Defendants' arguments on appeal, the points are not addressed in this Opinion.

## 1. Defendants' Doctrinal Approach

{27} Defendants first attack the application of prima facie tort in this case on the ground that allowing the claim impermissibly evades stringent requirements of established doctrines of law, as warned against by *Schmitz*. Within this point, Defendants contend Plaintiff evaded the following doctrines: (1) tort law is based on instances of breach of a legal duty and not on breach of a contractual duty; (2) tort law does not override the right not to contract with others, regardless of motive; (3) tort law cannot be used to rewrite contracts; and (4) tort remedies are not available to remedy the breach of the covenant of good faith and fair dealing. I do not find Defendants' arguments convincing given the circumstances of this case.

{28} First, Defendants assert that torts provide remedies for the breach of duties that arise by law, but torts do not create legal duties. Defendants point out that this "established doctrine" was alluded to in *Schmitz*, which stated that prima facie tort "provides a remedy for plaintiffs who have been harmed by a defendant's intentional and malicious acts that fall outside of the rigid traditional intentional tort categories." *Schmitz*, 1990-NMSC-002, ¶ 35. Defendants further point to New Mexico case law that "[c]ourts have long followed the rule that the difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law." *Kreischer v. Armijo*, 1994-NMCA-118, ¶ 6, 118 N.M. 671, 884 P.2d 827 (alteration,

internal quotation marks, and citation omitted); *see also Cottonwood Enters. v. McAlpin*, 1991-NMSC-044, ¶ 11, 111 N.M. 793, 810 P.2d 812 (stating that "the tort of negligence must be based upon a duty other than one imposed by the contract"). Based on the distinction between a legally imposed duty and a contractually imposed duty, Defendants argue that the gravamen of Plaintiff's prima facie tort claim was the breach of a contractual duty by Defendants, namely, the wrongful termination of the Agreement, not breach of a separate legal duty. Defendants note that the claim was submitted to the jury based on Defendants' termination of the Agreement, not on any duty imposed by law separate from the obligations described in the Agreement. Thus, Plaintiff "never identified—much less established—a duty created by law (as opposed to one created solely by contract) that [Defendants] breached" with regard to the act of terminating the Agreement.

{29} Defendants then turn to *Schmitz*. According to Defendants, nothing in *Schmitz* suggests that prima facie tort applies to conduct that is authorized by contract. Defendants argue that *Schmitz* instead stands for the propositions that the conduct complained of cannot fit into any other established tort category, must fall outside of the rigid traditional tort categories, and cannot be used to evade stringent requirements of other established doctrines of law, including the employment at-will doctrine. Defendants then argue that *Schmitz* was based on authority from jurisdictions that have held that prima facie tort does not apply to conduct that is

expressly authorized by contract. Specifically, Defendants rely on cases from New York and Missouri that have held that prima facie tort does not apply to wrongful termination claims in at-will employment scenarios and argue that malicious exercise of a contractual right is generally not an actionable claim. Defendants contend that *Schmitz* was formulated from tracing the development of prima facie tort in New York and Missouri, *see Schmitz*, 1990-NMSC-002, ¶¶ 35-48, and that the highest courts in these states have held that prima facie tort does not apply to wrongful termination claims by at-will employees. Defendants rely on *Dake v. Tuell*, 687 S.W.2d 191, 192 (Mo. 1985) (en banc), which held that discharged at-will employees cannot sue for wrongful discharge by "cloaking their claims in the misty shroud of prima facie tort." Defendants also rely on *Murphy v. American Home Products Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983), which held that the prima facie tort doctrine cannot be used to circumvent the at-will employment doctrine.

{30} Defendants attempt to attach to this argument line a logical progression from *Vigil v. Arzola*, 1983-NMCA-082, ¶ 17, 102 N.M. 682, 699 P.2d 613, *rev'd on other grounds by* 1984-NMSC-090, 101 N.M. 687, 687 P.2d 1038, which held that the at-will employment "rule rests upon the concept of freedom of contract" and has been described "as permitting an employer to discharge, for good cause, for no cause[,] or even for cause morally wrong, without thereby being guilty of legal wrong." (Internal

21

quotation marks and citation omitted.)[7] Defendants support this theme by tracing the Missouri cases of *Lundberg v. Prudential Insurance Co. of America*, 661 S.W.2d 667 (Mo. Ct. App. 1983), and *Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo. Ct. App. 1980), relied on in *Schmitz*, to language in an early Missouri case, *Loewenberg v. De Voigne*, 123 S.W. 99 (Mo. Ct. App. 1909). Defendants contend that, according to *Porter*, 611 S.W.2d at 273, *Loewenberg* indicated "that no amount of bad intent can render a lawful act actionable in damages" and that under *Loewenberg*, 123 S.W. at 99, even the "malicious" exercise of a contractual right is not actionable and "proof that the thing done was done from the worst of motives will not make the matter complained of actionable."

---

[7] With regard to Defendants' argument that prima facie tort cannot, in the face of wrongful termination claims, apply in at-will employment scenarios, the majority sees no application here. I agree with Plaintiff that Defendants tried their case on a for-cause theory, willingly abandoned their at-will argument, and cannot now seek to backpedal on their strategic decision. *See Gracia v. Bittner*, 1995-NMCA-064, ¶ 1, 120 N.M. 191, 900 P.2d 351. Likewise not compelling is Defendants' attempt to circumvent their decision to proceed on a for-cause theory by drawing a parallel between this case and at-will cases, as opposed to arguing that the Agreement was at-will. Defendants have not cited any authority that supports the proposition that parties terminated "for cause" have no "legally protected interest" under prima facie tort. Where a party provides no support for a proposition, the appellate courts assume that none exists. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that where a party cites no authority to support an argument, the appellate courts may assume no such authority exists); *ITT Educ. Servs., Inc. v. N.M. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (stating that this Court will not consider propositions that are unsupported by citation to authority).

{31}    Connecting *Schmitz* to a later analysis by our Supreme Court in *Beavers v. Johnson Controls World Servs., Inc. (Beavers I)*, 1994-NMSC-094, ¶ 39, 118 N.M. 391, 881 P.2d 1376, as to whether its *Schmitz* rulings could be applied retroactively, Defendants point to *Beavers I*'s analysis of the importance of reliance in analyzing whether the *Schmitz* ruling was to be applied retroactively. Defendants read *Beavers I* to hold that *Schmitz* applied retroactively because "prima facie tort does not apply where parties rely on the terms of a contract to govern their conduct and to avoid liability[,]" and according to Defendants, "[t]hat is precisely what happened in the present case."

{32}    Listed as a separate sub-point, Defendants' second doctrinal argument is similarly based on freedom of contract. Defendants emphasize the significance of freedom to contract by highlighting our Supreme Court's public policy determination in *Tharp v. Allis-Chalmers Manufacturing Co.*, 1938-NMSC-044, ¶ 13, 42 N.M. 443, 81 P.2d 703, that is, "[I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced[.]" (Internal quotation marks and citation omitted.) Defendants also cite *United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 1989-NMSC-030, ¶¶ 8, 13-14, 108 N.M. 467, 775 P.2d 233, which expresses New Mexico's strong public policy of freedom of contract, stating that "[g]reat damage is

23

done where businesses cannot count on certainty in their legal relationships and strong reasons must support a court when it interferes in a legal relationship voluntarily assumed by the parties." (Internal quotation marks and citation omitted.) In addition, Defendants buttress their policy argument by citing to this Court's opinion in *Quintana v. First Interstate Bank of Albuquerque*, 1987-NMCA-062, ¶¶ 6, 12, 14, 105 N.M. 784, 737 P.2d 896, which held that "regardless of the motive for its decision[,]" a party has the right "to refuse to do business with [another party,]" and the exercise of that right will not give rise to a claim for tortious interference with contractual or prospective contractual relations because "[t]he right to choose freely one's business relations has been described as a fundamental right[.]" Defendants then extend New Mexico's policy favoring freedom of contract to the present case by asserting that courts interpreting New Mexico law have considered freedom of contract and the appropriateness of prima facie tort in the context of termination of at-will employees and independent contractors, and Defendants contend that these courts have properly held that prima facie tort is inapplicable. *See Schmitz*, 1990-NMSC-002, ¶ 63 (citing *Lundberg*, 661 S.W.2d at 671); *see also Ewing v. State Farm Mut. Auto. Ins. Co.*, 6 F. Supp. 2d 1281, 1291 (D.N.M. 1998) (recognizing the holding in *Schmitz* that prima facie tort cannot be used to avoid the employment-at-will doctrine and concluding that "it is unlikely that [prima facie tort] was meant to

interfere with a company's prerogative to select its employees or independent contractors").[8]

{33} Defendants further rely on an unpublished Tenth Circuit Court of Appeals order and judgment in *Jackson v. Freightliner Corp.*, No. 94-2163, 1996 WL 500666, at *4-5 (10th Cir. Sept. 5, 1996) (order), as holding, under New Mexico law, principally *Quintana*, 1987-NMCA-062, ¶¶ 11-12, that a party is justified in its contractual decisions and prima facie tort cannot be used to modify the absolute right of businesses to choose with whom they want to do business. Defendants offer *Smith v. Price's Creameries*, 1982-NMSC-102, ¶¶ 23-24, 98 N.M. 541, 650 P.2d 825, in

---

[8] In their brief in chief and apparently as a sub-point to this argument, Defendants include a footnote arguing that there is reversible error based on the district court's refusal to give a requested instruction on whether the Agreement was terminable at will. As stated in the previous footnote, the majority declines to consider Defendants' argument. The record reflects that before trial Defendants sought a determination that Plaintiff's agency was or could have been terminated under an at-will termination provision in the Agreement but that Defendants voluntarily dropped the issue after the court ruled on Defendants' legal right to terminate Plaintiff. Defendants chose not to pursue their terminable-at-will angle at trial but, rather, based their defense on their right to terminate the agency for cause as a result of Plaintiff's breach of the Agreement. The district court's refusal to permit Defendants' last minute proffer of an instruction on at-will status was appropriate given that Defendants willingly abandoned their at-will theory. Defendants' last minute attempt to raise the terminable-at-will instruction issue constitutes a case of too little too late, and the matter will not be considered. *See Gracia*, 1995-NMCA-064, ¶ 17 ("[A]llegations of error that were not preserved in a timely fashion to allow the trial court to correct the error [will] not be the subject of reversal on appeal."); *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

which our Supreme Court determined that there was no need to inquire into the defendant's motives in seeking to terminate a distributorship contract because the Court had no power to modify the "cancellation 'for any reason[]' " provision and because the plaintiff could not recover even if the defendant terminated the contract in bad faith. Defendants acknowledge that there are some limitations on the freedom of contract but deny that any such limitations apply in this case, and thus, Plaintiff evaded the freedom of contract doctrine in pursuing his prima facie tort claim.

{34} Third, Defendants assert that "parties should not be allowed to use tort law to alter or avoid the bargain struck in the contract" and that "[t]he law of contract provides an adequate remedy." *AmRep Sw., Inc. v. Shollenbarger Wood Treating, Inc.*, 1995-NMSC-020, ¶ 28, 119 N.M. 542, 893 P.2d 438. In addition, Defendants return to *Smith*, 1982-NMSC-102, ¶¶ 24-26, in which the Court affirmed summary judgment for the defendant and rejected the plaintiff's claim that a question of fact existed as to whether the contract had been terminated in good faith. Defendants argue from these cases that "[t]he district court erred in using prima facie tort as the vehicle for allowing the jury to rewrite the Agreement to impose a 'proper motive' limitation on [Defendants'] termination rights."

{35} Fourth and finally within their doctrinal attack, Defendants argue that a breach of the implied covenant of good faith and fair dealing claim and remedies were evaded by submitting prima facie tort to the jury. Defendants contend that New

26

Mexico recognizes a claim for breach of the implied covenant of good faith and fair dealing with respect to contracts that are not terminable at will and that the claim sounds in contract, and for that reason, such claims are not subject to tort remedies for the breach. *See Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 17, 117 N.M. 434, 872 P.2d 852 (stating that "tort remedies are not available for breach of the implied covenant in an employment contract").

{36}     Additionally, Defendants point to *United States ex rel. Custom Grading, Inc. v. Great American Insurance Co.*, 952 F. Supp. 2d 1259, 1269-70 (D.N.M. 2013) (mem.), in which the court dismissed the plaintiff's prima facie tort claim because "New Mexico law adheres to the economic-loss doctrine," which "prevents plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract[.]" (Internal quotation marks and citations omitted.) Defendants argue that, by permitting Plaintiff to proceed with his prima facie tort claim, the district court erred in allowing Plaintiff's claim "to evade both (i) his burden of proving a breach of the implied covenant and (ii) the contract-damages-only limitation for a breach of the implied covenant[,]" resulting in Plaintiff receiving substantial tort damages "for the lawful exercise of a contractual right."

{37}     Defendants' points regarding the differences between tort and contract doctrines are solid reasons for requiring Plaintiff to have pleaded and pursued contract claims based on a theory that his termination was wrongful, pretextual, and

27

carried out with the malicious intent to harm and without sufficient justification. And, in fact, the Dissent looks to the doctrinal differences between tort and contract as providing grounds for reversal. *See generally* Dissent *infra* ¶¶ 92, 104. As has been thematic from start to finish in this Opinion, however, the manner in which this case was tried leads to a result that disfavors Defendants' and the Dissent's positions. The fact that the jury verdict favored Plaintiff in prima facie tort in effect shows that Defendants chose their for-cause contract clause as a cover for their true intent. As highlighted earlier in the procedural section of this Opinion, Defendants urged and the district court apparently agreed that Plaintiff's conduct coupled with the plain language of the Agreement allowed Defendants to terminate Plaintiff under the for-cause terms of the Agreement. In deciding the merits of Plaintiff's contract-related claims, I see no indication that the district court took into consideration or that Plaintiff adequately pleaded or in any way actually pursued[9] the argument that the reasons given for his termination were "bogus" and, importantly, the parties apparently agreed that the covenant generally requiring that the parties act in good faith did not apply given the district court's ruling on the express provision allowing

---

[9] Although not raised as an issue on appeal, I question whether Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims actually sought recovery based on the alleged wrongful termination. Plaintiff's operative complaint alleged breach of contract based on Defendants' conduct during and after the termination (i.e., failure to pay Plaintiff contract value, failure to supply a proper U5 form, and failure to provide meaningful review by the Termination Review Board), not the termination itself.

28

termination. Although not raised by either party, I seriously question whether the express language of the Agreement allowing termination or a ruling that Defendants were authorized to terminate pursuant to an express provision in the Agreement necessarily would have prohibited contract-related claims based on pretext or ruse if they had been carefully and clearly pursued.

{38} The district court and the parties seemed to believe that in finding that the Agreement could be properly terminated under the facts of this case, as a logical extension, there could be no breach of the implied covenant of good faith and fair dealing. Although breach of the implied covenant cannot be used to negate an express term in a contract, "every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." *Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449, 188 P.3d 1200; *see Melnick v. State Farm Mut. Auto. Ins. Co.*, 1988-NMSC-012, ¶ 17, 106 N.M. 726, 749 P.2d 1105 (agreeing with "those courts that have refused to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract"). In the present case, I see no definitive analysis from the district court that the breach of the implied covenant claim was necessarily dismissed in light of any particular ruling. I am not wholly convinced, given the facts supporting bad faith and that Defendants used the Agreement to carry out their malicious motives, that the covenant was so

easily disposable absent some explicit determination that the covenant did not apply under a contract theory of termination based on pretext or ruse. Had Plaintiff aggressively pursued his "bogus" angle as to Defendants' stated reasons for terminating Plaintiff by arguing, based on the facts ultimately proved at trial, that Defendants' true motive was to harm Plaintiff without sufficient justification, we might be in a different situation. I posit that Plaintiff could have pleaded and persuasively argued that his termination was unlawful under breach of contract and/or breach of the implied covenant of good faith and fair dealing on the ground that the termination was nothing more than a pretext or ruse to accomplish the termination based on malicious intent to harm that ends in harm, without sufficient justification. *See, e.g.*, *Hartnett v. Papa John's Pizza USA, Inc.*, 912 F. Supp. 2d 1066, 1114-15 (D.N.M. 2012) (mem.) (denying a motion for summary judgment on the plaintiff's breach of employment contract claim because there were genuine issues of material fact as to whether the defendant complied with its agreement to terminate the plaintiff for cause); *Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 516 (Iowa 1992) (holding that "the jury was entitled to find that [the employer's] stated reason for discharge—a staff reduction—was pretextuous and thus constituted a breach of contract"); *Cannon v. Nat'l By-Products, Inc.*, 422 N.W.2d 638, 642 (Iowa 1988) (stating that, in the context of a breach of an employment contract claim, "the jury could have found that the stated reason for the employer's termination of [the]

plaintiff's employment was not sincere, and the reasons given were pretextuous" and that such findings "should not be disturbed on appeal"); *Kestenbaum v. Pennzoil Co.*, 1988-NMSC-092, ¶¶ 1, 15, 36, 108 N.M. 20, 766 P.2d 280 (upholding a jury verdict based on breach of an employment contract in favor of the plaintiff who could only be terminated for cause and who was not actually terminated for good cause); *Kiedrowski v. Citizens Bank*, 1995-NMCA-011, ¶¶ 14-15, 119 N.M. 572, 893 P.2d 468 (holding that there were genuine issues of material fact that precluded summary judgment on the plaintiff's breach of contract claim because there were facts to suggest that the employer was motivated by illegitimate and self-serving reasons and terminated the plaintiff under the pretext of poor performance). Had Plaintiff pursued a contract theory that Defendants' termination of the Agreement was based on pretext and/or a ruse to cover the true, malicious, and unjustified reasons for the termination, I doubt that a ruling from the district court that Defendants were technically authorized to terminate the Agreement pursuant to its express provisions would have been dispositive of Plaintiff's contract-related claims.

{39}   I firmly believe that the manner in which this case was tried warrants a decision that cautiously and narrowly affirms but limits the application of prima facie tort to the circumstances in which the clearly viable, available, and established contract-related doctrines of unlawful termination based on pretext, ruse, malice, and lack of justification never came to light. The Special Concurrence disagrees, seeing

31

this to simply be a case in which the contract-related claims failed as viable, available, and established contract-related doctrines, notwithstanding that those claims were never based on a theory of an unlawful termination based on pretext, ruse, malice, and lack of justification. *See* Sp. Con. *infra* ¶ 80. I believe that had this contract theory been pleaded and pursued, the doctrine of prima facie tort, with its element of a lawful termination instead of lack of such element, would necessarily have been eliminated. The Special Concurrence mistakenly takes the view that a pretextual termination claim and theory of Defendants' unlawful conduct were before the district court. *See* Sp. Con. *infra* ¶ 80. As indicated earlier in this Opinion, they were not. The Opinion's approach hardly partakes of guess work or musing. Its approach is to show that what happened in this case, i.e., the manner in which this case was tried, centering only on the lawfulness of termination based on Plaintiff's technical breach, left established, viable contract theories of unlawful pretextual termination unaddressed, thereby leaving no alternative than to send prima facie tort to the jury. Any viable contract theory of unlawful pretextual termination could have overridden any technically "lawful" termination. As indicated earlier, because of the particular nature of this case, no opinion in this case should be considered precedent or authority for any expansion of prima facie tort.

{40}     I do note that Defendants, in their fourth sub-point, now try to rely on the existence of the covenant of good faith and fair dealing to argue that Plaintiff should

be prohibited from pursuing a prima facie tort claim. However, Defendants do not provide a cite to the record where this argument regarding Plaintiff's alleged attempt to evade the requirements of a breach of the implied covenant and its remedies was made before the district court. And based on a review of the record, it does not appear that Defendants developed any argument that Plaintiff had, but failed to pursue, a breach of the implied covenant claim based on a pretextual termination use of the for-cause clause as a cover for the conduct ultimately proved under prima facie tort. Therefore, the majority holds that the argument was not preserved. *See In re T.B.*, 1996-NMCA-035, ¶ 13, 121 N.M. 465, 913 P.2d 272 ("[W]e review the case litigated below, not the case that is fleshed out for the first time on appeal."); *Gracia*, 1995-NMCA-064, ¶ 17 ("[A]llegations of error that were not preserved in a timely fashion to allow the trial court to correct the error [will] not be the subject of reversal on appeal."); *Woolwine*, 1987-NMCA-133, ¶ 20 ("To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court."). Even were the majority to determine that Defendants somehow barely preserved this argument by the broad note that Plaintiff's claim evaded the requirements of a contract claim, consistent with our logic as earlier explained, because Defendants moved to dismiss the implied covenant of good faith and fair dealing claim and were successful in ultimately getting a dismissal of that claim, the majority likewise rejects Defendants' argument that

33

Plaintiff's use of prima facie tort allowed Plaintiff to evade his burden of proving breach of the implied covenant and the "contract-damages-only" limitation.

{41} In addition to concerns with Defendants' doctrinal position in light of the particular circumstances of this case, the majority does not accept Defendants' argument that contract law can generally provide an adequate remedy at law in circumstances where a termination is carried out pursuant to an express provision in an agreement and when breach of the implied covenant of good faith and fair dealing is unavailable. Defendants sought and agreed to a dismissal of Plaintiff's breach of the implied covenant claim. Defendants' position from the start and throughout was that a termination effectuated pursuant to an express clause in a contract should be deemed lawful and not subject to or in violation of the implied covenant of good faith and fair dealing, while simultaneously taking the position that terminating a contract for malicious and unjustifiable reasons is not punishable in tort. Accepting Defendants' propositions would permit a party to maliciously and unjustifiably terminate a contract under the guise of some technicality without restriction. In Defendants' ideal world, there would never be a way for a party to obtain relief in for-cause terminations that are technically authorized but nevertheless pretextual and are actually carried out as a ruse and cover for a termination based on malice with intent to harm the terminated party and without justification.

## 2. Defendants' Element-Based Approach

{42}     Defendants' second attack is that Plaintiff failed, as a matter of law, to satisfy at least three of the four essential elements of prima facie tort outlined in *Schmitz*, namely, intent to injure, injury, and absence of justification. *See* 1990-NMSC-002, ¶ 37. Defendants assert that Plaintiff also failed to satisfy a fifth "unique factual allegations" requirement. Defendants rely on *Carreon v. Goodtimes Wood Products, Inc.*, No. CIV 09-161 BB/CEG, 2011 WL 9686895, *13 (D.N.M. Mar. 22, 2011) (mem.), which states that "a plaintiff cannot simply base [a prima facie tort] claim on the same allegations that support his other claims" and that "the prima facie tort cause of action is useful only when there are factual allegations that are somehow unique, that do not give rise to another tort or contracts claim, but that demand redress." They also rely on *Healthsource, Inc.*, 2005-NMCA-097, ¶ 36, that affirmed a district court's dismissal of a prima facie tort claim when the plaintiff did "not assert any separate factual basis to support its prima facie tort claim."

{43}     As to the intent to injure and injury requirements, Defendants focus on the United States District Court of New Mexico's ruling in *Hill v. Cray Research, Inc.*, 864 F. Supp. 1070, 1079-80 (D.N.M. 1991) (mem.), that dismissed the plaintiff's prima facie tort claim against his former employer either because the termination of the plaintiff's at-will employment was a breach of an implied contract or a wrongful discharge, and therefore was unlawful and not subject to prima facie tort, or because

35

the plaintiff's termination was lawful and thus there was no intent to injure him. Defendants similarly argue that because they did not breach the Agreement, the intent to injure and injury requirements could not be established given that the intent to injure and injury only apply to a legally protected interest of Plaintiff as required by the Restatement (Second) of Torts § 870, cmt. e, as adopted in *Schmitz*, 1990-NMSC-002, ¶¶ 46-47. Defendants contend that Plaintiff, as a matter of law, had no legally protected interest once the district court ruled that the Agreement was lawfully terminated. Within this argument, Defendants take the opportunity to reassert their positions (1) that prima facie tort cannot be used to avoid the employment-at-will doctrine, and (2) that it is unlikely that prima facie tort was meant to interfere with a company's prerogative to select its employees or independent contractors. *See id.* ¶ 63 (recognizing that "prima facie tort cannot be used to avoid employment[-]at[-]will doctrine"); *see also Ewing,* 6 F. Supp. 2d at 1291 ("[I]t is unlikely that [prima facie tort] was meant to interfere with a company's perogative to select its employees or independent contractors."); *Yeitrakis v. Schering-Plough Corp.*, 804 F. Supp. 238, 247-49 (D.N.M. 1992) (mem.) (holding that "prima facie tort is unavailable to remedy the termination of an at[-]will employee" (emphasis omitted)). Although Defendants do not argue that this is an employment-at-will situation, they do argue that the same rationale in *Schmitz*, *Ewing*, *Yeitrakis*, and *Hill* should apply.

36

{44} As to the absence of sufficient justification requirement, Defendants argue that conduct that is authorized by contract is justified for purposes of prima facie tort. *See Carreon*, 2011 WL 9686895, at *13 (stating that if there was no breach of contract, the defendant's "legal position was justified and cannot be the basis of a claim for prima facie tort"); *see also Jackson*, 1996 WL 500666, at *5 (affirming dismissal of a prima facie tort claim where the defendant "was justified in withholding consent . . . because it had an absolute right to choose the individuals with whom it wished to have contractual relations").

{45} And as to the unique factual allegations requirement, Defendants reiterate that a plaintiff cannot simply base a prima facie tort claim on the same allegations that would support other claims available or asserted and that the prima facie tort allegations must be unique and not give rise to another tort or contract claim. Defendants argue that an actor's lawful conduct cannot be brought within or overlap other more traditional categories of liability and that the factual basis for the prima facie tort claim cannot be identical to the factual basis for all of the other alleged claims. Thus, Defendants argue, uniqueness was lacking given that, in setting out his claims for relief, Plaintiff incorporated all of the averments in all of the preceding paragraphs of his complaint, including allegations relating to breach of contract and breach of the implied covenant of good faith and fair dealing, and that the district

37

court instructed the jury that Defendants' termination of the Agreement was the only conduct that could constitute prima facie tort.[10]

{46} Defendants' argument against the intent to injure and injury elements hinge on Defendants' employment-at-will-related argument made in their doctrinal appeal and on the district court's ruling that the termination of the Agreement was authorized. Our rejection of Defendants' use of the concept earlier in this Opinion likewise applies here. *See supra*, notes 7-8. Defendants have provided no persuasive case law support for their proposition that the limitation on prima facie tort claims in the employment-at-will arena should apply in the present case. Nor have they for their proposition that "[t]he district court's ruling that the Agreement was lawfully terminated[] rendered [Plaintiff's] prima facie tort claim defective, as a matter of law, because he no longer had the legally protected interest needed to satisfy the 'intent to injure' element."

{47} The majority also disagrees that Plaintiff failed, as a matter of law, to satisfy the absence of justification requirement. Defendants' argument that they were justified in terminating Plaintiff simply because the Agreement gave them discretion

---

[10] Although Defendants represent that "[t]he jury was specifically instructed that [Defendants'] termination of the Agreement was the only conduct that could constitute prima facie tort[,]" the majority does not read the instruction so broadly. In fact, the jury was instructed that "[i]n order to recover damages from any Defendant on this claim, Plaintiff must show as to that Defendant: [t]hat Defendant intentionally terminated or intentionally took actions that resulted in the termination of [the] Agreement[.]"

38

to terminate is unavailing. The primary case cited by Defendants, *Carreon*, 2011 WL 9686895, is factually distinct. In *Carreon*, the court determined that there were triable issues of fact under breach of contract that precluded submission of prima facie tort to a jury. *Id.* at *13. In the present case, as I have emphasized throughout this Opinion, as the case was tried, Plaintiff was left with no existing breach of contract claim or contract-related claim. Moreover, *Carreon* did not conduct the balancing required by *Schmitz* to determine whether there was sufficient justification. *See Schmitz*, 1990-NMSC-002, ¶ 46.

{48}      According to *Schmitz*, "if a defendant offers a purpose other than the motivation to harm the plaintiff as justification for his actions, that justification must be balanced to determine if it outweighs the bad motive of the defendant in attempting to cause injury." *Id.*; *see* Restatement (Second) of Torts § 870, cmt. c. In balancing the justification offered by Defendants, a fact-finder is required to weigh "[t]he nature and seriousness of the harm to the plaintiff; . . . [t]he fairness or unfairness of the means used by the defendant[s]; . . . [the d]efendant[s'] motive or motives; and . . . [t]he value to [the] defendant[s] or to society in general of the interests advanced by the defendant[s'] conduct." UJI 13-1631A NMRA. Importantly, the *Schmitz* Court rejected a higher burden adopted by some jurisdictions that "conduct [must be] done without *any* beneficial end[.]" *Schmitz*, 1990-NMSC-002, ¶¶ 45-46 (emphasis added). Defendants have not attacked the sufficiency of

39

Plaintiff's evidence of lack of justification proved in the eyes of the jury. Further, as a matter of law, merely articulating a motivation to terminate the Agreement based on Plaintiff's contract breach, without weighing Defendants' alleged bad motives, does not and cannot alone disprove the justification element. Moreover, given that the appellate courts do not reweigh the evidence when considering justification, *see Beavers II*, 1995-NMCA-070, ¶ 19, and given that the jury was adequately instructed as to the balancing test, the majority declines to hold that Plaintiff failed to satisfy the absence of justification requirement.

{49} Also unavailing is Defendants' argument that prima facie tort, although typically articulated as having four elements, *see* UJI 13-1631 NMRA, must be dismissed if Plaintiff fails to meet a fifth element—offering unique factual allegations that do not give rise to other tort or contract claims. In support of their contention, Defendants cite to *Healthsource*, 2005-NMCA-097, ¶ 36. Although *Healthsource* does state that in prima facie tort the factual allegations must be unique, the majority does not agree that this statement in *Healthsource* imposes an additional prima facie tort element. Instead, *Healthsource* was elaborating on a rule found in many New Mexico cases addressing prima facie tort—that "a prima facie tort claim may not be used as a means of avoiding the more stringent requirements of other torts." *Id.* ¶ 35; *see Stock*, 1998-NMCA-081, ¶ 38 ("Prima facie tort should not be used to evade stringent requirements of other established doctrines of law." (alteration, internal

40

quotation marks, and citation omitted)); *see also Ribble*, 2003-NMCA-093, ¶ 11 (same); *Hagebak*, 2003-NMCA-007, ¶¶ 24, 27, 29 (same). Although pleading identical facts may indicate that a claim is improperly duplicative, as in *Healthsource*, 2005-NMCA-097, ¶ 36, this Court has also "been willing to recognize a prima facie tort claim, even though the conduct in question bore a resemblance to another cause of action." *Hagebak*, 2003-NMCA-007, ¶ 27.

{50} In the present case, although Plaintiff's prima facie tort claim bore a resemblance to his other claims in that virtually all of the claims in his complaint were based on the same set of facts, Plaintiff's prima facie tort claim, as it turned out, was not used to evade stringent requirements of other established doctrines of law. Again, as I have stressed throughout this Opinion's discussion of the issues, given the way in which the case was tried, there was no other claim available to Plaintiff besides prima facie tort under which to pursue damages resulting from the termination that was malicious and executed with the intent to harm. As expressed earlier, although I am not convinced that Plaintiff, as a matter of law, was necessarily prevented from asserting in contract that Defendants acted in bad faith despite Defendants' acknowledged legal right to terminate Plaintiff under the contract, the parties' approach left prima facie tort as the only claim that was susceptible to submission to the jury.

41

## 3.    Defendants' Policy-Oriented Approach

{51}    Finally, Defendants argue that affirming the judgment would mean that parties who properly perform their contracts face greater exposure than those who breach them. Defendants predict that "[i]f the judgment . . . is affirmed and becomes a part of the law of this [s]tate, the certainty and predictability of contracts will be seriously undermined." According to Defendants, this is because "[n]o one entering a contract will know whether some jury will later decide that they do not think the bargain struck was fair or they do not feel a party enforced its contractual rights with the right frame of mind."

{52}    Defendants argue that with the judgment standing, damages can be significantly greater than those for breach of the Agreement's termination-at-will provision that limits compensatory damages for breach of the Agreement to three months of commissions. Further, individuals, such as Carroll and Allin, who were not parties to the Agreement can be subject, as they were here, to a million dollar judgment. Defendants assert that "cautious individuals will need to hire their own independent counsel to advise them of the consequences of discharging their job responsibilities even when they scrupulously comply with all relevant contractual requirements." Defendants point out that, ironically, because contract damages are expressly limited, the danger of being found liable for tort damages would only apply

if a contract were wholly complied with. Defendants then assert that "tortifying" contracts in this way is not recognized by our courts and is bad law and bad policy.

{53} The majority rejects Defendants' policy-based argument that affirmance of the judgment would (1) mean that parties who properly perform their contracts face greater exposure than those who breach them, and (2) negatively impact the certainty and predictability of contracts in New Mexico.[11] The majority does not agree that upholding this prima facie tort verdict, under the peculiar circumstances in this case, generally undermines "the certainty and predictability" of contracts. Because our holding is shaped by the particular circumstances here, as has been explained throughout this Opinion, a limited application of prima facie tort cannot be said to generally threaten New Mexico businesses or their dependence on freedom of contract given the absence at the parties' insistence of contract claims, combined with Defendants' clearly egregious tortious conduct under the guise of a legitimate business interest in terminating an agent's contract. It is our sanguine expectation that business activities do not rise to the egregious level of pretextual, ruse-filled conduct

---

[11] The majority also notes that although Amicus' arguments mostly overlapped with Defendants' arguments, Amicus did make additional policy-based arguments that accepting Plaintiff's interpretation of prima facie tort would hinder business in New Mexico because it would produce a "chilling effect," "create a vacuum of guidance," increase the cost of business in New Mexico, discourage economic investment, and increase litigation. However, Amicus provides no support for its arguments. The majority therefore declines to consider the merits of the arguments. *See ITT Educ. Servs. Inc.*, 1998-NMCA-078, ¶ 10 (stating that this Court will not consider propositions that are unsupported by citation to authority).

such as that proved here. The proof required for a successful prima facie tort claim, coupled with the requirement that prima facie tort not be used to evade stringent requirements of other established doctrines of law, confines prima facie tort to a narrow space.

**THE PUNITIVE DAMAGES ISSUE**

{54} The appellate courts review de novo the constitutionality of punitive damages, making an independent assessment of the record in order to determine whether the jury's award of punitive damages is comparatively reasonable. *Aken*, 2002-NMSC-021, ¶¶ 17-19.

{55} Defendants argue two reasons why the punitive damages award violated the Due Process Clause of the Fourteenth Amendment. The first is that, under several United States Supreme Court cases, procedural safeguards were required but not implemented. The cases, in the order cited and discussed by Defendants, are *Pacific Life Insurance Co. v. Haslip*, 499 U.S. 1 (1991), *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993). The second is that the award does not comport with *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996).

{56} The procedural safeguards argument consists of the *Haslip* requirement that procedural safeguards must be provided for due process purposes, 499 U.S. at 20-22, 23 n.11, combined with the ruling in *Campbell*, 538 U.S. at 417, that "defendants

44

subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding[,]" even though punitive damages serve the same purposes as criminal penalties. Defendants lay out the concerns expressed in *Campbell* as to the wide discretion typically left in jury instructions in choosing amounts and that "the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Id.* (internal quotation marks and citation omitted). And, further, as *TXO Products* states, "emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations, a risk that is of special concern when the defendant is a nonresident." 509 U.S. at 464.

{57}     Defendants contend that the jury instructions did not adequately protect them. They argue that a combination of factors led to the jury's resulting prejudice: (1) the court did not give a proffered instruction that provided further clarification in regard to punitive damages insofar as it required the jury to "consider the punishment and deterrent effect associated with an award of compensatory damages"; (2) the district court allowed evidence of the Companies' wealth to go to the jury; and (3) in closing argument, Plaintiff's counsel, "well aware that corporate wealth would poison the jury," emphasized the collective net worth of the Companies and urged the jury to punish Farmers, a wealthy, out-of-state corporation. Defendants find support in

45

*Campbell*, 538 U.S. at 427, which states that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."

{58} The second basis for Defendants' attack on the punitive damages award arises from guideposts set out in both *Gore* and *Campbell*. These guideposts are (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between compensatory and punitive damages, and (3) a comparison of the punitive damages with criminal or civil penalties that can be imposed for similar conduct. *Gore*, 517 U.S. at 575-84. The *Gore* guideposts are to be considered within the context of "[e]lementary notions of fairness enshrined in . . . constitutional jurisprudence . . . that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a [s]tate may impose." *Id.* at 574.

{59} Defendants also list five factors for evaluating reprehensibility, taken from *Campbell*, 538 U.S. at 419, all of which Defendants contend weigh against punitive damages, and Defendants combine with each factor why it was not met.

> 1. Whether "the harm caused was physical as opposed to economic[.]" [*Campbell*, 538 U.S. at 419. Plaintiff] presented no evidence that he suffered physical harm.
>
> 2. Whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others[.]" *Id.* [Plaintiff's] Agreement was terminated, in accordance with its terms, because he breached it. This does not implicate health or safety issues for [Plaintiff] or anybody else.

46

3. Whether "the target of the conduct had financial vulnerability[.]" *Id.* Again, [Plaintiff], a sophisticated and experienced insurance agent, presented no evidence that he was uniquely vulnerable. To the contrary, he established that he earned significant income as a Farmers agent and [Plaintiff's] own expert testified that 40 percent of his business was with companies other than Farmers and therefore not impacted by his termination.

4. Whether "the conduct involved repeated actions or was an isolated incident[.]" [*Id.*] The termination of [Plaintiff's] Agreement was a one-time occurrence, and [Plaintiff's] evidence was limited to his particular circumstances, and therefore the lawful but allegedly tortious conduct here is incapable of repetition.

5. Whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* [Plaintiff] never argued that the termination of his Agreement involved trickery or deceit. And, . . . [Plaintiff] failed to prove that [Defendants] bore any malice toward [Plaintiff].

{60} Defendants emphasize *Campbell*'s statement that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.* And further, that there is a presumption that compensatory damages make a plaintiff whole, "so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

{61} Defendants also argue, in particular, that the ratio of 2.5 times the $1 million compensatory damages award is unconstitutionally excessive, citing *Campbell*'s view that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only

47

equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* at 425. Defendants further argue that the district court's having upheld the award, in part, on the basis that seven of Plaintiff's employees lost their jobs when the Agreement was terminated, was contrary to the express holding in *Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007), that the award violated due process in punishing the defendant for harm to a non-party. And Defendants argue that there exist no criminal or civil penalties with which to compare the punitive damages award given that Defendants' legal termination of the Agreement according to its terms violated no law and was not punishable at all, and the district court erred in failing to consider this factor.

{62}     Although the particular facts of this case and the litigation decisions made again give us pause, in light of our holding that prima facie tort was appropriate in this case, the majority does not agree that the jury instructions regarding punitive damages violated Defendants' due process rights either by failing to provide procedural safeguards or because the punitive damages award ran afoul of the *Gore* guideposts or *Campbell* factors. First, as noted by Plaintiff, our Supreme Court has approved of a punitive damages jury instruction that explains that (1) the jury " 'may' award punitive damages[,]" (2) "that the purpose of punitive damages is to punish and deter wrongful conduct[,]" (3) "that the jury should act toward the ends of reason and justice," and (4) "that punitive damages must relate to actual damages and the injury

48

sustained." *Aken*, 2002-NMSC-021, ¶ 13. The instruction given in this case fully complied with *Aken* and, additionally, mirrored New Mexico's Uniform Jury Instruction regarding punitive damages. *See* UJI 13-1827 NMRA. The jury was adequately instructed that it *may* award punitive damages if it found that the conduct of Defendants was malicious. The jury was also instructed as to the nature of the jury instruction—i.e., that the purpose of punitive damages is to punish and deter—and that any award must be based on reason and justice. Finally, the jury was instructed that any award must be reasonably related to the injury and other awarded damages. Thus, the jury instruction provided adequate safeguards and did not violate Defendants' due process rights. Although presentation of a defendant's worth *may* be problematic and result in a large punitive damages award, Defendants have not shown that this jury improperly acted on any prejudice against Defendants because they are or are associated with a big business.

{63}     Second, the jury's award complies with the *Gore* guideposts. Although there are no criminal or civil penalties that can be imposed for Defendants' conduct, the first two factors are applicable and weigh heavily in favor of Plaintiff. In this case, Plaintiff presented evidence of reprehensible conduct regarding the malicious and intentional treatment of and harm to him. The majority rejects Defendants' argument that the *Campbell* factors regarding reprehensibility weigh against a punitive damages award. Defendants' intentional and malicious behavior toward Plaintiff rightfully

49

exposed Defendants to liability. In light of Defendants' actions and the damage to Plaintiff and given our affirmance of submitting the underlying prima facie tort claim to the jury, the majority holds that the evidence in this case supports a 2.5:1 ratio between the punitive damages award and the compensatory award.

**CONCLUSION**

{64}     The judgment and post-trial orders entered in the district court are affirmed.

{65}     **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

**MICHAEL D. BUSTAMANTE, Judge (specially concurring)**

**J. MILES HANISEE, Judge (dissenting)**

**BUSTAMANTE, Judge (specially concurring).**

{66} I specially concur in Judge Sutin's Opinion affirming the judgment. I write separately because I see no reason to second-guess the parties' litigation strategy below. In my view, prima facie tort was invoked and litigated in this case just as our Supreme Court envisioned in *Schmitz*. I also write to respond to the dissent's concern that allowing prima facie tort to operate in this context is a threat to freedom of contract.

{67} Prima facie tort was not a new concept when our Supreme Court adopted it in *Schmitz*, 1990-NMSC-002, ¶¶ 36-39. Its roots are found in the scholarly writings and opinions of Justice Oliver Wendell Holmes, Jr. In an early article and a series of lectures later gathered into his book, *The Common Law*, Holmes organized tort law into the three categories recognized today: liability without fault, negligence based on an objective standard of care, and intentional tort. Oliver Wendell Holmes, Jr., *The Theory of Torts*, 7 Am. L. Rev. 652 (1872-1873); O.W. Holmes, *The Common Law*, 104-17 (M. Howe ed. 1963). Holmes' early writing on intentional torts was marked by an attempt to ground liability on a policy-based, objectively determined standard akin to his general theory of negligence. *See generally* Kenneth J. Vandevelde, *A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort*, 19 Hofstra L. Rev. 447, 471-76 (1990); Kenneth J. Vandevelde, *The Modern Prima Facie Tort Doctrine*, 79 Ky. L.J. 519, 521-25 (1990/1991).

51

{68}     Thirteen years after the publication of *The Common Law*, Holmes revisited the topic of intentional torts. Oliver Wendell Holmes, Jr., *Privilege, Malice, and Intent*, 8 Harv. L. Rev. 1 (1894). Perhaps influenced by the writings of Frederick Pollock, Holmes took an entirely new approach to the theory of intentional torts. *See* Vandevelde, *supra*, at 522-25. Gone was the disjointed discussion of long-recognized causes of action. Focusing on injury to economic interests caused by the trade union movement and by business competitors, Holmes instead posited the "common-place" general proposition that "the intentional infliction of temporal damage or the doing of an act manifestly likely to inflict such damage and inflicting it, is actionable if done without just cause." Holmes, *supra*, at 3. Justification would most often be in the form of a claim of privilege. *Id.* at 9. Claims of privilege would require careful review of the particular circumstances of each case, but in the final analysis would be determined as a matter of policy with courts consciously weighing the advantages to the community in allowing recovery versus allowing the damage to be suffered with no remedy. *Id.* In weighing claims of privilege, Holmes asserted that courts should consider the nature of the defendant's acts—including the motive—plus the nature of the consequences and the closeness of the bond between motive and consequences. *Id.* at 13.

{69}     As Professor Vandevelde notes, the article marked a shift in Holmes' thinking. He embraced a general theory of intentional tort. As Holmes made clear, his object

52

in the article was "to make a little clearer the method to be followed in deciding [such cases]." Holmes, *supra*, at 14. And, Holmes "decided that motive, including malice, could be considered by the court in determining whether intentionally injurious conduct was without justification, i.e., whether it was actionable." Vandevelde, *supra*, at 523 (emphasis omitted). Thus, in one fell swoop, Holmes proposed a new way of analyzing liability for intentional acts.[12]

{70}   It is likely that Holmes saw his idea as a true general theory of intentional torts; an analytical approach which could support existing intentional torts as well as supply a means of dealing with novel factual circumstances. On the Massachusetts bench, he relied on his theory to dissent in two labor relations cases. *See Vegelahn v. Guntner*, 44 N.E. 1077, 1079-82 (Mass. 1896) (Holmes, J., dissenting); *Plant v. Woods*, 57 N.E. 1011, 1015-16 (Mass. 1900) (Holmes, C.J., dissenting). In each case, Holmes argued that the injunctions entered against the unions were improper given the social advantages to be potentially gained from their nonviolent acts. In *Moran*

---

[12] Holmes was not writing in a vacuum. The thought that infliction of injury without justification was actionable was articulated in *Dexter v. Cole*, 6 Wis. 319 (1858) and *Ricker v. Freeman*, 50 N.H. 420 (1870), though neither case involved the type of intentional tort Holmes was addressing. The first articulation of the principle in a setting fitting Holmes' theory was *Walker v. Cronin*, 107 Mass. 555 (1871). *Walker* involved a claim arising from a labor dispute that the defendants induced plaintiff's employees to leave their job. The Massachusetts Supreme Judicial Court reversed the trial court's dismissal and remanded for trial noting that "[t]he intentional causing of such loss to another, without justifiable cause, and with the malicious purpose to inflict it, is of itself a wrong." *Id.* at 562.

*v. Dunphy*, 59 N.E. 125 (Mass. 1901), a case involving a claim that the defendant had induced the plaintiff's employee to leave, Holmes analyzed the case using only the theory he had expounded in his articles. In addition, he asserted that the court's prior cases—from *Walker* through *Plant*—all agreed with and supported his analytical approach, including the idea that "motives may determine the question of liability[.]" *Moran*, 59 N.E. at 126.

{71}    *Aikens v. Wisconsin*, 195 U.S. 194 (1904), is the most enduring expression by Holmes of his theory. "It has been considered that, prima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape." *Id.* at 204.[13] *Aikens* involved a constitutional challenge to a state statute making it unlawful to "combine . . . for the purpose of willfully or maliciously injuring another in his reputation, trade, business, or profession, by any means whatever[.]" *Id.* at 201 (omission in original) (internal quotation marks and citation omitted). Holmes decided the statute was constitutional, in part, by observing "that such a combination, followed by damage, would be actionable even at common law." *Id.* at 204. He supported that assertion with an analysis grounded entirely on his general theory.

---

[13] It is in my view unfortunate that this quote provided the common name for the tort. Holmes had not used the term before. Perhaps it was the result of his feeling that his approach had been fully accepted. If so, his hubris was misplaced.

{72} If Holmes' ambition for his general theory was that it would supplant the established intentional torts, it was not to be. The cases prompting the discussions by Holmes and others involved primarily injuries to economic interests caused by trade unions or business competitors. Holmes' formulation of a general intentional tort did not find application much beyond that realm even in Massachusetts. *Tuttle v. Buck*, 119 N.W. 946, 948 (Minn. 1909) (holding that setting up a business not for the sake of profit but for the sole purpose of driving another out of business was actionable); *see* Vandevelde, *supra*, at 484-95 for a general discussion. New York, for a time, seemed to accept Holmes' formula and apply it as he might have. *Advance Music Corp. v. Am. Tobacco Co.*, 70 N.E.2d 401, 403 (N.Y. 1946) (explicitly agreeing with Holmes' formulation in *Aikens* and holding that an assertion that the defendant's misrepresentation as to the popularity of certain songs was made with intent to injure the plaintiff stated a cause of action for "a prima facie tort"). But New York's definition of the tort has devolved into a specific tort so qualified, hemmed, and limited as to make it a legal non-sequitur. *See Morrison v. Nat'l Broad. Co.*, 266 N.Y.S.2d 406, 408-09 (App. Div. 1965) (holding that lying to a contestant in a rigged quiz show, thus harming his academic reputation and prospects, did not fit within the definition of prima facie tort), *rev'd on other grounds by* 19 N.Y.2d 453 (1967).[14]

---

[14] It is possible that New York has now abandoned the requirement that the facts asserted not fit within any other nominate tort. *See Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n*, 343 N.E.2d 278, 284-85 (N.Y. 1975).

55

{73} Missouri's adoption of the Restatement version of Holmes' formulation helped to revive his vision, though not as a general theory of intentional tort. *Porter*, 611 S.W.2d at 272. The Restatement formulation echoes Holmes. It states:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

Restatement (Second) of Torts § 870. The comments to the section assert that the section "purports to supply [a] unifying principle" for intentional torts and "to explain the basis for the development of the more recently created intentional torts." Restatement (Second) of Torts § 870 cmt. a. The same comment indicates, however, that the more important work of the section is to "serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts." *Id.* This latter comment reflects the preference courts have shown for discrete, specifically described torts. It also reflects the commonplace that the field of compensable wrongs has not been—nor should it be—closed.

{74} If Holmes' general theory is now limited to considering unnamed intentional wrongs, his most lasting contribution to the law in this area is his discussion of how to consider a defendant's claim of privilege and justification in the face of aggravated

56

conduct. And, in an age when the courts universally recognize the normative functions of the law of torts, Holmes' consideration of the character of the means used and the subjective motives of the defendant looms especially large. *See, e.g.*, *Saiz v. Belen Sch. Dist.*, 1992-NMSC-018, ¶ 26, 113 N.M. 387, 827 P.2d 102. The law can and should consider the harm done, the means by which it was done, and the state of mind that motivated the act in deciding whether, as a matter of policy, an injury should go unremedied—whatever the context in which the acts occurred.

{75} The Supreme Court was aware of this history when it decided *Schmitz*. Its discussion at paragraphs thirty-four through fifty-two make clear that it understood the roots, approach, and utility of the tort it was adopting. It consciously adopted Holmes' analysis—as expressed in the Restatement—as the method New Mexico courts would use to decide when redress is required for injury caused by insufficiently justified, malicious, intentional conduct intended to cause injury.

{76} The uniform jury instructions guiding juries faithfully reflect the Supreme Court's adoption of the Restatement. They place a high burden of proof on the plaintiff to prove intentional acts by the defendant intended to cause harm to the plaintiff. UJI 13-1631. The defendant can plead justification but the plea is subject to a balancing process to "determine if it outweighs any motive of [the] defendant to injure [the] plaintiff." UJI 13-1631A. The factors to weigh include (1) the nature and gravity of the harm inflicted, (2) the fairness of the means used by the defendant, (3)

57

the defendant's motives, and (4) the value to the defendant or society in general of the interests advanced by the defendant's conduct. *Id.* The weighing process allows the parties to argue the policies for and against allowing recovery in a given factual context rather than in a vacuum. Obviously, malicious intent can work to vitiate social utility.

{77} Understanding that the tort was intended to operate interstitially, the Supreme Court cautiously limited its application to instances where the facts do not fit crystallized torts, that is, where no other intentional tort provides a remedy. *Schmitz*, 1990-NMSC-002, ¶ 48.[15] This limiter has been the source of some uncertainty, and underlies much of Judge Sutin's concerns. In my view, *Schmitz* provides a ready answer for this case. Further, given how thoroughly the case was litigated, this is not the appropriate case to address the concerns Judge Sutin raises.

{78} Under *Schmitz*, prima facie tort can be pleaded and litigated in the alternative. But, when it comes to submitting the case to the jury, if the "plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted to the jury on that cause and not under prima facie tort." *Id.* A theory or cause of action is "susceptible to submission" to a jury only if it has escaped

---

[15] A persuasive case that this limiter is not necessary has been made by Professor Vandevelde. Vandevelde, *supra*, at 539-40. Even New York may have abandoned this requirement. But it is not my place to question the Supreme Court's choice.

58

dismissal by summary judgment, directed verdict, or Rule 1-012(B)(6) NMRA. *Schmitz*, 1990-NMSC-002, ¶ 48.

{79} Here, all of Plaintiff's causes of action other than prima facie tort were dismissed by summary judgment on Defendants' motions. The dismissed theories were not "susceptible to submission" to the jury. Once the summary judgments were granted, the dismissed causes were not available to Plaintiff as a matter of law. *Schmitz* cannot be read to require more of litigants or trial courts.

{80} This is not a case in which a plaintiff tried to evade other potential causes of action. Plaintiff pleaded all conceivable causes and proceeded to lose them to dismissal at Defendants' urging. One cause of action is the subject of much discussion and merits response. Judge Sutin theorizes that Plaintiff should have pursued his contract claims more assiduously by arguing that his termination was wrongful and pretextual and thus contrary to the imposed covenant of good faith and fair dealing. Judge Sutin relies on cases such as *Kestenbaum*, 1988-NMSC-092. The employment termination cases were of no help to Plaintiff. The primary factual issue in those cases was whether there had been a breach of the employee's contract by the employer; more specifically, whether the plaintiff was fired for actual good cause under their contract. Breach by the employer is the context in which the idea of pretext arose in *Kestenbaum* and the other wrongful termination cases. Here, there was undeniably a breach of the agency contract—by Plaintiff. Plaintiff's agency

59

placed business with another company, a terminable breach. Once that fact was found, summary judgment on the breach of contract claim in favor of Defendants was inevitable. Using the covenant of good faith and fair dealing to challenge a finding of breach in this context runs the risk of morphing it into a tort-like adjunct to contract law. Perhaps it would be a good idea to start crystallizing such a tort, but its potential impact is much broader than the relatively narrow scope of prima facie tort. This case certainly does not call for the effort or even the discussion.

{81}    There is nothing to be gained and much to be lost in Judge Sutin's second-guessing approach. There is no hint in the record or argument by Defendants that Plaintiff "threw the fight" in any of his motion practice. There is no reason for this Court—or the district court—to engage in that inquiry. How is it to be done in any event? Are courts to question motive? ("Did you mean to lose that motion counsel?"). Are they to suggest litigation tactics and arguments to counsel? If so, should both counsel be examined and "counseled," or only the plaintiff's attorney? To engage in second-guessing at the appellate level is even more problematic. All we can do is wonder at what was done and why. If the issue was preserved below, there is no need to wonder in a vacuum because the arguments have been made and we can assess them on the record. If the subject of our second-guessing was not preserved or even argued—as is the case here—our musings are perforce of no avail. Absent a miscarriage of justice, we will not disturb a jury verdict. There is certainly no

miscarriage here. This case involves aggravated facts and serious harm that Defendants do not dispute. We are left to musing about how counsel should have been smarter and worked harder, all to no discernible end.

{82} In sum, the case was vigorously litigated. There is no need or reason to revisit how it was litigated. Subject to Defendants' failed motion to dismiss prima facie tort, all parties agreed at the end that only prima facie tort was left to be submitted to the jury. The jury has spoken.

**THE DISSENT**

{83} I disagree with the dissent's assertion that the factual circumstances here are exempt from the purview of prima facie tort simply because they arose in the context of a contractual relationship between the parties. The dissent argues for a categorical exemption from tort liability, regardless of behavior and motive. The cases cited by the dissent do not support such an exemption and its ipse dixit policy argument ignores the lesson and point of Holmes' work on which it purports to rely.

{84} First, the cases the dissent relies on simply do not support a categorical exemption. *Guest v. Allstate Insurance Co.* did hold that an attorney could not claim future, unearned fees as an item of damage from a former client. 2010-NMSC-047, ¶ 25, 149 N.M. 74, 244 P.3d 342; *see* Dissent *infra* ¶ 100. The basis for ruling—the need to protect the attorney/client relationship—says nothing about the propriety of

61

immunizing an entire field of human activity from scrutiny for wrongdoing.[16] And *Andrews v. Stallings*, 1995-NMCA-015, 119 N.M. 478, 892 P.2d 611, is a run-of-the-mill case in which the defamation claim was the appropriate tort to pursue. *See* Dissent *infra* ¶ 101.

{85}     Second, the dissent misconstrues Holmes' theory in his article *Privilege, Malice, and Intent*. Holmes' effort in the article was to posit a general theory of intentional tort useful as a method for analyzing claims for injury caused by intentional acts. He did not posit any specific outcomes in cases. He did note that some policies—such as the free use of land—were so ingrained in the law and society that they were likely to provide justification no matter what motive an actor had for use of land.[17] But Holmes did not say that even such uses should be forever free from scrutiny or liability. The dissent ignores its own quote from Holmes' article "When the question of policy is faced[,] it . . . cannot be answered by generalities, but must be determined by the particular character of the case . . . plainly the worth of the

---

[16] It is notable, though not relevant here, that no one in *Guest* saw any difficulty in allowing the plaintiffs' contract claims and the prima facie tort claims to both go to the jury.

[17] It should be noted, however, that even the free use of land had its limits at common law. It was subject to challenge as a nuisance. And the case of *Fletcher v. Rylands*, 3 H. & C. 774, 159 Eng. Rep. 737 (1865)—the basis for strict liability for hazardous activities—involved a water reservoir which failed, flooding a neighbor's mine.

result, or the gain from allowing the act to be done, has to be compared with the loss which it inflicts." Holmes, *supra*, at 3.

{86} Defendants and the dissent refuse to engage the "particular character of the case" or to conduct a comparison of gain and loss in light of motive. The facts in this case are egregious. After a very successful eleven-year career as a "stellar agent" for Defendants, Plaintiff was summarily terminated after one mistake which was quickly remedied. The motive for the termination could range from petty bureaucratic revenge to unmitigated greed. As a result of his termination, Plaintiff lost all income from the business. His clients and commissions were distributed to the persons who carried out the termination. And all of this occurred while Plaintiff's wife was away for an extended time with a serious kidney disease. In effect, the jury found that the individuals who effected the firing acted like corporate hyenas and jackals cannibalizing their own. I see no reason to say that Plaintiff should "have expected as much" when he signed his agency agreement.

{87} There is no question Defendants intended the firing and the harm. As to justification, Defendants' only response is "because we can."[18] But, as the court in *Plant* noted, that "proposition is a mere truism." 57 N.E. at 1014. Immunity for intentional, harmful conduct requires an inquiry into motive. As Holmes noted in his

---

[18] Defendants' position is Nixonian: "If the president does it, it's legal."

63

article, "It is entirely conceivable that motive, in some jurisdictions, should be held to affect all, or nearly all, claims of privilege." Holmes, *supra*, at 9. The jury found Defendants' motive to be malicious, and their conduct inexcusable. Defendants fail to appreciate that the tort and verdict address that conduct and motive. The termination itself works primarily to provide a measure of damages.

{88}     Defendants' argument that this verdict will undermine "freedom of contract" may be addressed by the fourth factor under UJI 13-1631A: "The value to [the] defendant or to society in general of the interests advanced by the defendant's conduct." But Defendants do not—cannot—explain how allowing petty bureaucratic revenge or greed to motivate and control their relationship with their agents is necessary to its business model or its success. Defendants do not—cannot—explain how shielding the egregious conduct present here is important to them or what value it contributes to society in general. Defendants do not—cannot—explain how immunizing hyena-like behavior is necessary to defend freedom of contract. Defendants do not attempt to explain because any arguments made would be specious on their face. In this context, Defendants' assertion of "freedom of contract" is not just a cliche; it is a shibboleth.

{89}     More generally, Defendants' assertion of freedom of contract fails to take into account other developments in the law that are aimed at ameliorating the potential for the law of contract to devolve into the law of the jungle. Internal to the world of

contract, the law imposes the implied covenant of good faith and fair dealings. *Cont'l Potash, Inc. v. Freeport-McMaron, Inc.*, 1993-NMSC-039, ¶ 64, 115 N.M. 690, 858 P.2d 66. The covenant makes subjective motive and "right conduct" part of the conversation when assessing breaches of contract. This law has not destroyed freedom of contract, though it probably humanizes it. Prima face tort can do the same.

{90} In the insurance field, the courts have created the tort of bad faith. *See* UJIs13-1701 to -1705 NMRA. The obligations imposed on insurers by common law bad faith concepts are much broader than anything that might be imposed by prima facie tort.[19] The torts of economic duress and interferences with contractual relations have their own potential to interfere with freedom of contract. But they were recognized in response to inappropriate behavior in the economic realm. *See Terrel v. Duke City Lumber Co.*, 1974-NMCA-041, ¶ 97, 86 N.M. 405, 524 P.2d 1021 (recognizing tort of economic duress), *aff'd in part and rev'd in part on other grounds by* 1975-NMSC-041, 88 N.M. 299, 540 P.2d 229; *see also Wolf v. Perry*, 1959-NMSC-044, ¶ 15, 65 N.M. 457, 339 P.2d 679 (recognizing tortious interference with contract). They have not destroyed freedom of contract and neither will this verdict.

**MICHAEL D. BUSTAMANTE, Judge**

---

[19] One wonders how an insurer would fare in an action by one of its insureds alleging the type of callous and cruel behavior visited on Plaintiff here.

**HANISEE, Judge (dissenting).**

{91} Today's majority injects the specter of prima facie tort liability into commercial relationships governed first by contracts and, when necessary, doctrinal contract law. In upholding the jury's verdict, the majority authors downplay the requirements of existing and directly applicable causes of action—not only in contract but also in tort. The end result is that Defendants' right to enforce and terminate an indisputably breached contract that neither violates public policy nor is a contract of adhesion is negated.

{92} Confusingly, Judge Sutin agrees that there "are solid reasons for requiring Plaintiff to have pleaded and pursued contract claims based on a theory that his termination was wrongful, pretextual, and carried out with the malicious intent to harm and without sufficient justification." Op. *supra* ¶ 37. He also agrees that "Plaintiff could have pleaded and persuasively argued that his termination was unlawful [as a] breach of contract and/or breach of the implied covenant of good faith and fair dealing[.]" Op. *supra* ¶ 38. And Judge Bustamante allows that our Supreme Court "cautiously limited [prima facie tort's] application to instances where the facts do not fit crystallized torts[.]" Sp. Con. *supra* ¶ 77. Why, then, does the jury's verdict stand when it seems we agree that it is hornbook law that prima facie tort may not be used to "evade stringent requirements of other established doctrines of law[?]" *Schmitz*, 1990-NMSC-002, ¶ 63; *see also Stock*, 1998-NMCA-081, ¶ 38 (holding that

66

prima facie tort may not serve to "escape possible restrictions" to another tort's applicability).

{93} Judge Sutin suggests that the reason is "the particular manner in which this case was tried," Op. *supra* ¶ 3, and "the peculiar circumstances in this case[.]" Op. *supra* ¶ 53. While true that "there was no other claim available to Plaintiff besides prima facie tort under which to pursue damages" from Defendants, Op. *supra* ¶ 50, such was the circumstance *only* because, by the time of trial, Defendants had defeated Plaintiff's numerous directly applicable causes of action. So the only reason this case was tried at all is because the district court denied Defendants' motion for summary judgment on Plaintiff's prima facie tort claim. Hence, the lead opinion's justification for the occurrence of a trial on what was left of a disemboweled complaint—loudly "sounding in contract and tort[,]" Op. *supra* ¶ 9—begs the question of whether the district court erred in denying the last of an otherwise successful series of dispositive motions filed by Defendants.

{94} The occurrence of such an atypical trial, however, is no reason to affirm its outcome and in any event is hardly the fault of Defendants. To the contrary, Plaintiff was "the master of [his] complaint," *Self v. United Parcel Serv.*, 1998-NMSC-046, ¶ 17, 126 N.M. 396, 970 P.2d 582 (internal quotation marks and citation omitted), and likewise possessed sole control over whether to appeal the district court's dismissal of his contract- and tort-based claims. Yet Plaintiff chose not to plead the claims that

67

Judge Sutin suggests he "could have pleaded and persuasively argued[,]" Op. *supra* ¶ 38, and did not appeal from the district court's summary judgment in Defendants' favor on the predicate claims he did choose to plead. To uphold Defendants' liability under a legal doctrine of such limited applicability rings hollow, particularly given Judge Sutin's additional observation that the "express language of the Agreement" would not have necessarily "prohibited contract-related claims based on pretext or ruse *if they had been carefully and clearly pursued*." Op. *supra* ¶ 37 (emphasis added). Yet by some kind of judicial alchemy, the majority today turns Defendants' right to terminate the Agreement into liability for its exercise of that right, and Plaintiff's litigation failures (and his own breach of the Agreement) into a damages bonanza paid for by Defendants.

{95} Even less availingly, Judge Bustamante appears to seek an independent, stand-alone standard for application of prima facie tort: "egregious conduct[.]" Sp. Con. *supra* ¶ 88 . He would declare corporate behaviors ranging from "petty bureaucratic revenge to unmitigated greed[,]" Sp. Con. *supra* ¶ 86, to be damages-eligible, a zone of liability into which Defendants' "hyena-like" and "jackals cannibalizing their own[,]" behaviors fall. Sp. Con. *supra* ¶¶ 86, 88. Under Judge Bustamante's approach, district courts are to undertake a free-ranging assessment of a defendant's conduct in deciding if a prima facie tort claim is to be submitted to a jury, even when "crystalliz[ed,]" Sp. Con. *supra* ¶ 80, but element-rich causes of action fail on legal

68

grounds. Future plaintiffs might wonder why they should bother to plead on-point but proof-onerous causes of action. Which is exactly why the application of prima facie tort in New Mexico was tightly curtailed from the get-go, and has so remained. *See Stock*, 1998-NMCA-081, ¶ 39 ("[T]he [plaintiff's] claim of prima facie tort is duplicative of her other claims. But to the extent that it is not, we hold that application of that doctrine . . . would be an improper means of evading proof of essential, and appropriate, elements of those other claims.").

{96}     Ultimately, the majority authors and I fundamentally disagree about prima facie tort's place in New Mexico law. The tort was not created, nor were its elements designed, to serve as an infill upon which a plaintiff can erect a remedy when otherwise applicable torts or contract law do not afford redress. Quite the opposite: that a plaintiff is precluded from recovering under a different cause of action is often itself sufficient to demonstrate the inapplicability of prima facie tort. This conclusion flows from a proper historical understanding of the tort and the genesis of *Schmitz*'s "evasion" requirement. *See* 1990-NMSC-002, ¶ 63; *see also* James P. Bieg, *Prima Facie Tort Comes to New Mexico: A Summary of Prima Facie Tort Law*, 21 N.M. L. Rev. 327, 371 (1991) (expressing caution that "prima facie tort has the potential of eliminating the important policies and protections embodied in the elements of traditional torts, many of which have been developed over centuries, and replacing them with a nebulous, all-encompassing, and formless cause of action").

{97}    While Judge Bustamante rightly connects the origins of much of the framework of existing tort law to the work of Justice Holmes, his perspective regarding prima facie tort is incomplete. Indeed, Holmes rejected a formalist regime of tort liability and set out a more general theory for deciding cases where a plaintiff alleges that he has been injured by the defendant.

> Actions of tort are brought for temporal damage. The law recognizes temporal damage as an evil which its object is to prevent or to redress, so far as is consistent with paramount considerations to be mentioned. When it is shown that the defendant's act has had temporal damage to the plaintiff for its consequence, the next question is whether that consequence was one which the defendant might have foreseen. If common experience has shown that some such consequence was likely to follow the act under the circumstances known to the actor, he is taken to have acted with notice, and is held liable[.]

Holmes, *Privilege, Malice, and Intent*, *supra* at 1 (cited in *Schmitz*, 1990-NMSC-002, ¶ 36). To Holmes, the only question in determining whether to exempt a defendant from liability for damages to the plaintiff caused by the defendant's malicious acts is whether the defendant's actions, however malicious, may be justified or "privilege[d]." Holmes, *supra*, at 9. And whether a defendant's acts are privileged is ultimately a question of "policy; and the advantages to the community, on the one side and the other, are the only matters really entitled to be weighed." *Id.* Under Holmes' theory, the question of whether the defendant is privileged to inflict a harm "cannot be answered by generalities, but must be determined by the particular character of the case, even if everybody agrees what the answer should be. . . .

70

[P]lainly the worth of the result, or the gain from allowing the act to be done, has to be compared with the loss which it inflicts." *Id.* at 3.

{98}  But "[i]t seems inevitable that a tort conceived on the principle of prima facie liability for intentional infliction of harm would come to encroach upon bodies of law, like contract, which have more limited principles of liability." Mark P. Gergen, *Tortious Interference: How It Is Engulfing Commercial Law, Why This Is Not Entirely Bad, and A Prudential Response*, 38 Ariz. L. Rev. 1175, 1218 (1996). Hence the import of *Schmitz*'s use of the phrase "established *doctrines* of law." 1990-NMSC-002, ¶ 63 (emphasis added). The elements of a claim merely express the requirements of the underlying doctrine of substantive law that provides a remedy. It follows, then, that Plaintiff's inability to plead or prevail on a claim for breach of contract (or tortious interference with the Agreement into which the parties entered) may itself be a reason to question whether a claim for prima facie tort should be submitted to the jury. In other words, the fact that a plaintiff cannot obtain relief for injuries caused by the defendant in an action for breach of contract is evidence that the defendant was justified or privileged to cause the plaintiff's injuries. Gergen, *supra*, at 1221 (noting that if a claim "[falls] deeply in the shadow of another body of law," consideration should be given to determining whether dismissal is necessary in order to "preserve the priority of that other body of law").

{99}    Even Holmes evolved to limit his preferred generalized approach to tort liability by use of the term "disinterested malevolence," *Am. Bank & Tr. Co. v. Federal Bank*, 256 U.S. 350, 358 (1921), penned to mark the liability distinction between actions of right that cause harm and actions undertaken solely to cause harm. That notion is evident in *Aikens* itself, when Holmes addressed the unique state of mind that exists when harm is inflicted "for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired." *Aikens*, 195 U.S. at 203; *see also Marcella v. ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir. 1985) ("[W]hen there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of prima facie tort."). Here, regarding Defendants' termination of the Agreement with Plaintiff, the trial record amply supports business, profit, and associative motives far beyond disinterested malevolence.

{100}    The historic limitation of prima facie tort's application, intended by *Schmitz*, finds support in our case law. In *Guest*, 2010-NMSC-047, ¶¶ 47-56, our Supreme Court held on public policy grounds that a client is not liable to his lawyer for lost future earnings when the client terminates the attorney-client relationship. The attorney-plaintiff in *Guest* contended that even if lost future earnings were not available in a breach of contract action, they were nonetheless available in an action based on prima facie tort. *Id.* ¶ 57. Our Supreme Court disagreed, holding that "these

72

claims arose out of the same circumstances as [the attorney-plaintiff's] contract claim—her employment relationship with [the defendant]—[so the] reasoning applies regardless of the theory of liability." *Id.* This statement supports my view that if a plaintiff cannot prevail on breach of contract or the covenant of good faith and fair dealing for a good reason, then the plaintiff should not be allowed to prevail on a prima facie tort claim for the same reason—even when the formal elements of a prima facie tort claim are found by a jury to have been proven.

{101} This Court upheld the dismissal of a prima facie tort claim for similar reasons in *Andrews*, 1995-NMCA-015. In that case, we upheld the district court's dismissal of the plaintiffs' intentional infliction of emotional distress claim, reasoning that the claim was an "attempt[] . . . to make an end-run around the obstacles posed by defamation law's harm to reputation element and its constitutional aspects." *Id.* ¶ 48 (internal quotation marks and citation omitted). With respect to the plaintiffs' prima facie tort claim, we analyzed *Schmitz*'s "evasion" rule from a similar standpoint: "[whether plaintiffs'] prima facie tort is being asserted merely to circumvent the established defenses to defamation." *Id.* ¶ 64. In other words, we looked at the normative value of defamation (and its defenses) as *the* means of redress for harm caused by written statements. And we concluded that it outweighed the need to provide the plaintiffs with a secondary avenue by which liability might be established premised upon the harm caused by the defendants' acts. *Id.* ¶ 67.

{102} Holmes understood this issue as a question of privilege: when the benefits to society of requiring a plaintiff to proceed (and lose) under an established theory of law outweigh the benefits of allowing the plaintiff to recover for prima facie tort, we are in essence recognizing that the defendant has a privilege to harm the plaintiff. The example Holmes used is "the right to make changes upon or in a man's land[.]" Holmes, *supra* at 4. Even if a man makes changes to his own land with malicious intent to harm his neighbor, Holmes reasoned that the need to compensate the neighbor and punish the defendant for his malice would be outweighed by society's interest in encouraging landowners to invest in and develop their property. *Id.* "Were it otherwise, and were the doctrine carried out to its logical conclusion, an expensive warehouse might be pulled down on the finding of a jury that it was maintained maliciously, and thus a large amount of labor might be wasted and lost." *Id.*

{103} The straightforward question here is whether an existing and applicable doctrine of law requires us to decide this case in Defendants' favor, despite their concession on appeal that they acted with an intent to (and did indeed) harm Plaintiff. As Judge Sutin points out, Defendants' argument on this issue boils down to a straightforward contention that the jury's verdict, if allowed to stand, would fatally undermine the maxim of contract law that "public policy encourages freedom between competent parties of the right to contract, and requires the enforcement of contracts, unless they clearly contravene some positive law or rule of public morals."

74

*General Elec. Credit Corp. v. Tidenberg*, 1967-NMSC-126, ¶ 14, 78 N.M. 59, 428 P.2d 33. Judge Sutin dismisses this argument out of hand, concluding that Defendants' argument paints an "ideal[ized]" picture of a world in which there is "[no] way for a party to obtain relief in for-cause terminations that are technically authorized but nevertheless pretextual[.]" Op. *supra* ¶ 41. And the concurring opinion seems to prefer that freedom of contract be vaguely "humanize[d.]" Sp. Con. *supra* ¶ 89. But this is just a preference that applicable law incorporate considerations that it does not. Should we allow a plaintiff to obtain damages for harm caused by the exercise of an express term in a contract when that contract does not violate any public policy and is not one of adhesion? In upholding the jury verdict in this case, the majority authors do not answer this difficult (and to my mind, insurmountable) question.

{104} The public policy favoring the freedom of private parties to set the terms of their commercial relationships should not be discarded if a defendant's conduct, even if both legal and expressly contemplated by the contract, is by judicial measure sufficiently outrageous. The worn phrase "freedom of contract" may be cliché, but that does not mean we should ignore its application in this case. Bad blood and failed business ventures often keep close company. Courts should not sit in equity on claims arising from commercial relationships that wouldn't exist but for written contracts. Where the terms of a contract are clear—as here—we enforce them as written. The

parties would have expected as much when they entered the Agreement. I would reverse the district court's denial of Defendants' post-trial motion for a directed verdict on Plaintiff's prima facie tort claim. I therefore respectfully dissent.


_____

**J. MILES HANISEE, Judge**